# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | | **CRIMINAL ACTION** |
| | | **NO.  23-132** |
| **v.** | | |
| | | |
| **TEREVE WEST** | | |
| *Register # 51549-510* | | |
| FDC Philadelphia | | |

## OPINION

Defendant Tereve West was indicted on one count of violating 18 U.S.C. § 922(g)(1) for being a prohibited person in possession of a firearm.  He moves to dismiss the Indictment, arguing that Section 922(g)(1) is unconstitutional under the Second Amendment both as applied to him and facially, void for vagueness under the Due Process Clause of the Fifth Amendment, and beyond Congress's authority under the Commerce Clause.[1]  Fed. R. Crim. P. 12(b)(3).  For the reasons explained below, the Court will deny his motion.

## I.      BACKGROUND

According to the government, West was arrested after two Philadelphia Police Department officers heard gunshots a block from the patrol car they were in and approached the scene.  When the officers arrived, they saw two men, one of them later identified as West, walking quickly away from them.  As the officers pulled their patrol car alongside the men, West ducked down behind a car and picked up a yellow bag.  While frisking West, one of the officers saw a fired bullet casing.  The officers also searched the area around the car West had ducked behind, recovering two semi-automatic handguns (one equipped with an extended twenty-eight-

---

[1] The Court rejected a facial Second Amendment challenge, a void-for-vagueness challenge, and a Commerce Clause challenge in *United States v. Jenkins*, 2023 WL 6534200, at *1 n.1, *15-16 (E.D. Pa. Oct. 6, 2023).  The Court rejects the same challenges brought by West here for the reasons laid out in *Jenkins*.

round magazine) from the wheel well.[2]  A complete search of West revealed he was wearing a double-shoulder holster, designed to allow someone to carry two such handguns.

West's criminal history rendered him barred from possessing a firearm under federal law. In early 2020, he had robbed three people at gunpoint in the span of two hours.  For these crimes, West pleaded guilty in state court to robbery, conspiracy, and possession of a firearm by a prohibited person.  Following the incident described above, a federal grand jury returned a single-count Indictment against West for violating Section 922(g)(1).  West now moves to dismiss that Indictment.

## II.    LEGAL STANDARD

West's as-applied Second Amendment challenge calls on the Court to apply the new paradigm for evaluating gun restrictions announced in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  As the Court summarized in *Jenkins*, *Bruen* both expanded the reach of the right to bear arms for self-defense beyond the home and

> announced a new method for adjudicating Second Amendment controversies. In brief: Courts may no longer apply the traditional means-ends heightened-scrutiny analysis common to infringements on many constitutional rights.  Instead, the Court instructed, whenever conduct protected by the Second Amendment is burdened, courts are to proceed by analogy and compare historical firearms regulations to the challenged ones.  Only if the government can proffer enough older regulations sufficiently similar to the challenged laws may they pass constitutional muster.

*Jenkins*, 2023 WL 6534200, at *1.

Using this test, the Third Circuit in *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023 ) (en banc), held that Section 922(g)(1)'s lifetime disarmament was  unconstitutional as applied to a man who had committed food stamp fraud decades earlier and had not committed

---

[2] In addition, a witness had called 911 and explained to the operator that he had seen someone drop his guns behind the car from which they were recovered.

additional crimes since.  Since *Range* was decided, a large number of challenges to Section 922(g)(1) indictments have been filed.  In *Jenkins*, the first such challenge it addressed, this Court read *Range* to require a three-step process to analyze such motions.  First, the Court must "determine whether the Defendant is among 'the people' protected by the Second Amendment. Second, [it must] determine whether his reasons for carrying a firearm were congruent with Second Amendment protections.  Third, [it must] determine whether historical tradition protects the challenged regulation or its application" by means of historical analogical reasoning. *Jenkins*, 2023 WL 6534200, at *9.

*Bruen* provided some signposts on how to engage in the analogical reasoning it requires. The Supreme Court identified "at least two metrics" on which a court should compare a challenged regulation to the historical record: "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  142 S. Ct. at 2133.  And "when a challenged regulation addresses a general societal problem that has persisted since the 18th century"—such as disarming those who have committed serious crimes, as West has—"the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  *Id.* at 2131.  That said, "a historical *twin*" is not necessary, and the challenged firearm regulation need not be "a dead ringer for historical precursors."  *Id.* at 2133.

### III.   DISCUSSION

West's challenge fails because, even assuming *arguendo* that (1) he is one of "the people" entitled to the right to bear arms; and, (2) he was engaged in conduct protected by the Second Amendment, there is a robust historical tradition of disarming people with his criminal history.  The Government, which bears the burden at this final step in the *Range* analysis, argues

that West fits within our nation's historical tradition of firearm regulation because he "previously committed dangerous felonies"—multiple armed robberies—for which he could have been disarmed in centuries past.  In support of its position, the Government points the Court to a bevy of English and American laws aimed at disarming individuals or groups "deemed dangerous or untrustworthy" based on either status or conduct.

How to characterize motivations for—the "why," in *Bruen*'s parlance, of—the historical record of firearm regulations disarming people who have been convicted of felonies is the subject of robust jurisprudential debate.  Pre-*Bruen*, a plurality of the Third Circuit reasoned that such laws were justified because "the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"  *Binderup v. Att'y Gen.*, 836 F.3d 336, 348 (3d Cir. 2016) (en banc) (plurality opinion) (quoting *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010)).  Others, no doubt relying on the Supreme Court's repeated reference to the concept, root these laws in a requirement that legal gun-owners be "responsible."  *E.g.*, *Range*, 69 F.4th at 117 (Krause, J., dissenting) ("[T]he responsibilities that should accompany gun ownership are flouted by those who lack respect for the law."); *see District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) ("The Second Amendment . . . elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."); *Bruen*, 142 S. Ct. at 2156.

But some judges read the historical record more narrowly such that only disarming "those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety"—dangerous people—is justified.  *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting).  In then-Judge Barrett's view, "[t]his is a category simultaneously broader and narrower than 'felons'—it includes dangerous people who have not

4

been convicted of felonies but not felons lacking indicia of dangerousness."  *Id.*  Third Circuit judges who have endorsed this viewpoint alternately have described the group of "dangerous" people who historically could be disarmed as "persons who demonstrated that they would present a danger to the public if armed," *Binderup*, 836 F.3d at 369 (Hardiman, J., concurring in part and concurring in the judgment), those who had committed crimes that involved "the presence of force or violence," *Holloway v. Att'y Gen.*, 948 F.3d 164, 185 (3d Cir. 2020) (Fisher, J., dissenting), and those who that the mere "*potential*" to "erupt[] into violence," *Folajtar v. Att'y Gen.*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting) (emphasis added).

*Range* did not have occasion to address this theory "because the Government did not carry its burden to provide a historical analogue to permanently disarm someone like Range, whether grounded in dangerousness or not."  69 F.4th at 104 n.9.  And while this Court noted in *Jenkins* that, whatever else the historical record may support, there was a robust historical tradition of disarming people whom those in power considered dangerous, 2023 WL 6534200, at *12-13, resolving that challenge did not require picking between these characterizations of the historical record because the defendant there had not carried his burden of proving that he was engaged in conduct protected by the Second Amendment, *id.* at *16.

Here, too, the Court need not choose between these understandings because even the narrowest definition of dangerousness offered in the dissent in *Holloway* easily covers West, who committed a string of robberies with a gun.  Thus, Section 922(g)(1) is constitutional as applied to him.  The Supreme Court has emphasized that the Second Amendment "codified a right inherited from our English ancestors."  *Heller*, 554 U.S. at 599 (internal quotation marks and citation omitted).  The entirety of that historical tradition supports disarmament of people who have engaged in conduct like West's.

English law did not extend a right to carry weapons to people judged to be dangerous. The crime of "going armed 'to the terror of the people'" dates to the common law. 142 S. Ct. at 2145, 2182 (Breyer, J., dissenting). Even when people could carry a firearm in public, they could not do so in a manner injurious to the public peace. *Id.* at 2143. In 1662, the English Parliament went further, passing the Militia Act, which authorized "seiz[ing] all arms in the custody or possession of any person . . . judge[d] dangerous to the Peace of the Kingdom."[3] Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662). "Use of the Militia Act to disarm dangerous . . . persons continued unabated" after the passage of the English Bill of Rights in 1689, which included a precursor to the Second Amendment's right to bear arms, showing no tension between the two on that side of the Atlantic. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405 (2019).

The practice of disarming dangerous people, felons or not, was adopted in the American colonies too. *Kanter*, 919 F.3d at 454-46 (Barrett, J., dissenting). Colonial Massachusetts and New Hampshire both adopted laws authorizing the disarmament of "Affrayers, Rioters, Disturbers, or Breakers of the Peace." *Bruen*, 142 S. Ct. at 2142-43 (citing 1692 Mass. Laws no. 6, 11–12; 1699 N.H. Acts and Laws ch. 1). And during the Revolutionary War, multiple state governments mandated loyalty oaths, disarming those who would not swear their allegiance to the state. *Range*, 69 F.4th at 125 & nn. 76-85 (Krause, J., dissenting). These laws built on previous categorical bans on firearm possession by disfavored groups like Native Americans,

---

[3] Notably, in one post-*Bruen* case, the Third Circuit defined the outer bounds of the Second Amendment with reference to the Militia Act. *See Frein v. Pa. State Police*, 47 F.4th 247, 255 (3d Cir. 2022) ("The seeds of the Second Amendment were planted centuries ago in England, when King Charles II authorized his officers 'to search for and seize all Armes in the custody or possession of any person' whom they considered dangerous." (citing 13 & 14 Car. 2, c. 3, § 13)).

Black people, and Catholics.[4]  *Id.* at 122-24 & nn. 58-70; *see also United States v. Jackson*, 69 F.4th 495, 502-03 (8th Cir. 2023).  Most (if not all)[5] of these categorical bans were based on the then-legislature's judgment that these groups were dangerous to the political communities by which they had been elected.

Nor did these restrictions on the right to bear arms give way after the exigency of war subsided.  Critics of the Constitution at the Massachusetts ratifying convention proposed an amendment clarifying "that Congress may not 'prevent the people of the United States, who are *peaceable citizens*, from keeping their own arms.'"  *United States v. Hedgepeth*, 2023 WL 7167138, at *6 (E.D. Pa. Oct. 31, 2023) (quoting *Heller*, 554 U.S. at 681).  And, as discussed in *Jenkins*, the proposal at the Pennsylvania ratifying convention "to add a guarantee that 'no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals,'" which was "considered 'highly influential' by the Supreme Court in *Heller*," is "strong evidence" that dangerousness is a legitimate limitation on the right to bear arms.  *Jenkins*, 2023 WL 6534200, at *12 (quoting The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents, *reprinted in* Bernard Schwartz, 2 *The Bill of Rights: A Documentary History* 662, 665 (1971); and then quoting *Binderup*, 836 F.3d at 368 (Hardiman, J., concurring in part and concurring in the judgment)).

More of the same can be seen in the record following the enactment of the Second

---

[4] While the *Range* majority declined to rely on these laws to uphold Section 922(g)(1) in that case, it did so for reasons that are inapposite here.  In *Range*, the Government "d[id] not successfully analogize those groups to Range and his individual circumstances."  69 F.4th at 104-05.  Here, the Government has done exactly that, arguing that his "three convictions for gunpoint robberies" are among the "paradigmatic violent crimes" that have led to disarmament since the Militia Act.

[5] To be sure, it is difficult to imagine that laws disarming pacifist Moravians were passed because colonial governments thought that they were dangerous.  *Range*, 69 F.4th at 124 & n.70 (Krause, J., dissenting).

Amendment.  States not only disarmed those who by their previous conduct had demonstrated their dangerousness, but they also disarmed "those threatening to do harm" who failed to post a surety bond.  *Bruen*, 142 S. Ct. at 2148 & n.24 (collecting statutes); *see also* Me. Rev. Stat. ch. 169, § 16, 709 (1840); Mich. Rev. Stat. ch. 162, § 16, 162 (1846).  Other states retained the common-law prohibition on "go[ing] []or rid[ing] armed by night []or day."  *Bruen*, 142 S. Ct. at 2144, 2185 (Breyer, J., dissenting).

As the above historical record shows, there is a robust and consistent tradition of governments in England, its American colonies, and the early United States disarming those deemed to be dangerous, either based on their status or their conduct.  When applied to plainly dangerous felonies like armed robbery, Section 922(g)(1) does the same.[6]  The vast majority of district courts that have examined the issue are in accord.  *See United States v. Ladson*, 2023 WL 6810095, at *4 (E.D. Pa. Oct. 16, 2023) (collecting cases); *Cotton*, 2023 WL 6465836, at *4 (rejecting an as-applied challenge to a Section 922(g)(1) indictment where, like West, the defendant "was previously convicted of robbery and illegal possession of a firearm").  Thus, Section 922(g)(1) disarms West for the same reasons that earlier governments disarmed people like him, satisfying *Bruen*'s "why" inquiry.

The next question is whether the statute disarms West in sufficiently similar ways to laws in the historical record—the "how" question from *Bruen*.  On this issue, West argues that Section 922(g)(1) is constitutionally infirm because its "power to forever disarm all Americans convicted of felonies and even certain misdemeanors" has no historical analogue.  The Court does not read the statute or *Bruen*'s analysis that way.

---

[6] Note, too, that West has been convicted of violating Pennsylvania's own ban on gun possession by prohibited persons, reinforcing that "he has a history of disobeying firearm regulations specifically designed to protect public safety."  *United States v. Cotton*, 2023 WL 6465836, at *4 (E.D. Pa. Oct. 4, 2023).

First, as the Court laid out in *Jenkins*, Section 922(g)(1) might not always work a lifetime disarmament.  The majority in *Range* relied on the plaintiff's good behavior following his single, decades-old conviction to hold that the law was unconstitutional as applied to him.  *Jenkins*, 2023 WL 6534200, at *14.  That meant that, even if the pre-*Range* paradigm contemplated lifetime disarmament for committing a felony, now, "if a litigant's post-conviction conduct indicates that he is no longer part of a group of people whom there is a sufficient historical tradition of disarming, there is an independent basis for concluding that the law is no longer constitutional as applied to him, and the disarmament lifts."  *Id.*  As the Government acknowledged at a hearing on West's Motion to Dismiss, one cannot simply assume that Section 922(g)(1) will disarm someone for life anymore.

Second, and perhaps more fundamentally, West calls upon the Court to analyze Section 922(g)(1) at a level of generality inconsistent with *Bruen*.  *Id.* at *8.  *Bruen* emphasized that identifying a "historical *twin*" from the past was not necessary to survive its test.[7]  142 S. Ct. at 2133.  A modern firearm regulation's disarmament need not operate exactly the same way as Founding- or Reconstruction-era laws to be consistent with the Second Amendment.  Instead, the *Bruen* analysis, at proper level of generality, asks whether there is a sufficient historical tradition of the state identifying certain offenses that are so dangerous that those who committed them are not allowed to own firearms.  *See Hedgepeth*, 2023 WL 7167138, at *6.  This level of generality appropriately directs courts to, in *Bruen*'s words, "how," as a matter of principle, not precise practice, our forebears treated the right to bear arms.  *See Range*, 69 F.4th at 116-17 (Krause, J.,

---

[7] Nor does the Court read *Bruen* to say that, standing alone, "the lack of a distinctly similar historical regulation addressing" a problem dating to the eighteenth century renders a challenged firearm restriction *per se* unconstitutional.  142 S. Ct. at 2131.  Instead, that absence of historical support is merely "relevant evidence" pointing in that direction.  *Id.*

dissenting) ("[W]hen we draw on parallels with the past to assess what is permissible in the present, we typically look to match history in principle, not with precision.").

Analyzed at this level of generality, Section 922(g)(1)'s disarmament—especially as reworked by *Range*—is consistent with our nation's historical tradition.  Although many felonies were capital offenses at the founding of our nation, a fact that the Third Circuit has held does not illuminate the prevalence of the lesser punishment of having one's firearms taken away, *id.* at 105, not all led to execution, *Kanter*, 919 F.3d at 458-61 (Barrett, J., dissenting).  And for some of these non-capital crimes, an "offender was stripped of his then-existing estate, including any firearms." *Range*, 69 F.4th at 127 & nn. 98-99 (Krause, J. dissenting).  Firearm dispossession as punishment for committing a crime was not unknown to the founders.  Thus, Section 922(g)(1) as applied to West satisfies *Bruen*'s "how" inquiry as well.

In sum, in the context of a criminal defendant who recently was convicted of three robberies that he committed with a firearm, Section 922(g)(1) comfortably fits within this nation's historical tradition of disarming those who commit dangerous crimes.  Its penalty— disarmament that could last forever but also could lift depending on Defendant's conduct going forward—is sufficiently similar to punishments for non-capital offenses dating to the founding that forced criminals to surrender their firearms.  Therefore, Section 922(g)(1) survives *Bruen*'s historical-tradition test, and it is constitutional under the Second Amendment as applied to West.

## IV.    CONCLUSION

For the foregoing reasons, West's Motion to Dismiss the Indictment will be denied.  An appropriate order follows.

BY THE COURT:

*/s/ Wendy Beetlestone*
**WENDY BEETLESTONE, J.**